IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
January 25, 2005 Session

**JAMES A. VAUGHN v. STATE OF TENNESSEE**

**Direct Appeal from the Criminal Court for Sumner County
Case No. CR64-1999    Jane Wheatcraft, Judge**

_____

**No. M2004-00458-CCA-R3-PC - Filed April 22, 2005**

_____

The Petitioner, James A. Vaughn, was convicted of one count of first degree murder, three counts of attempted first degree murder, and one count of reckless endangerment, and the trial court sentenced him to an effective sentence of life plus twenty-two years. This Court affirmed the Petitioner's convictions and sentences on appeal. The Petitioner subsequently filed a petition for post-conviction relief, which the post-conviction court dismissed after a hearing. On appeal, the Petitioner contends that the post-conviction court erred because he was denied the effective assistance of counsel. Finding no reversible error, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which DAVID H. WELLES and JERRY L. SMITH, JJ., joined.

Cynthia Hall Templeton, Gallatin, Tennessee, for the Appellant, James A. Vaughn.

Paul G. Summers, Attorney General and Reporter; David H. Findley, Assistant Attorney General; Lawrence Ray Whitley, District Attorney General; and Sallie Wade Brown, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION
I. Facts**

On May 31, 1996, a jury convicted J. Vaughn[1] of the first degree murder of Tyrone Smith, the attempted first degree murder of Ardell Williams, the attempted first degree murder of Chris Williams, the attempted first degree murder of Tallis Bonds, and one count of reckless endangerment. This Court summarized the facts on direct appeal as follows:

---

[1]In order to distinguish the petitioner in this case from his uncle, Rearno Vaughn, who was also convicted of these crimes and who is the petitioner in another case currently before this Court, we will refer to this petitioner as "J. Vaughn" and to his uncle as "R. Vaughn."

Appellant [James A. Vaughn] was indicted for the first degree murder of Tyrone Smith, the attempted first degree murder of Chris Williams, the attempted first degree murder of Tallis Bonds, the attempted first degree murder of Ardell Williams, and one count of felony reckless endangerment as a result of events occurring on July 2, 1995. Around 2:00 a.m. that morning, a group of friends had gathered at "Wing Its," a local restaurant in Gallatin. As many as twenty people were present, including Tyrone Smith, Tallis Bonds, Ardell Williams, Chris Williams, Lemarcus Rickman, Keith Goodrich, Alonzo Rogan, Antonio Bonds, Germaine Mason, Joseph Lyles, and Ernest Redding. Several of those present were drinking beer and smoking marijuana. It was undisputed at trial that a number of those young men belonged to the "Zone 8" gang. [FN1]

> FN1. Testimony reflected that Zone 8 was a gang of youths from the black community that had been in existence since the late 1980's. Tyrone Smith and his twin brother, Gerome, were two of the founding members.

The crowd was gathered outside the restaurant and many were sitting on picnic tables waiting for their food to be served. Parked in a gravel lot across the street was the trailer portion of a tractor trailer. Some of the young men at the picnic table noticed two pair of feet visible under the trailer, as if two people were standing behind it. Suddenly, two men came around the side of the trailer and one said "What's up now, mother_____?" Both men brandished guns and a flurry of gunfire followed. The crowd scattered, with several people fleeing into the restaurant and others running down the street.

Four of those present were injured by the gunshots. Ardell Williams suffered five gunshot wounds to his left thigh and entry and exit wounds on his left ankle. Chris Williams suffered one gunshot wound to the buttocks. Tallis Bonds was shot in the back of his right thigh and the bullet exited just above the knee. He was also shot in the foot. Tyrone Smith was shot once in the left upper abdomen and the bullet exited his right chest area. Smith also had entry and exit gunshot wounds on his left thigh. Although Mr. Smith received two surgeries to repair his wounds, he died from complications four days after the incident.

At trial, four eyewitnesses to the shooting, Tallis Bonds, Keith Goodrich, Joseph Lyles, and Lemarcus Rickman, identified appellant as one of the gunmen. [FN2] Although he later denied doing so, Alonzo Rogan was the first person to identify appellant as a shooter immediately after the incident.

Based on earlier incidents, police believed appellant had motive for shooting Tyrone Smith. In February of 1995, the Appellant's uncle, Ronnie Vaughn, was killed by Gerome Smith. Gerome Smith is the twin brother of Tyrone Smith, the murder victim in this case. Law enforcement officials suspected, and the State theorized at trial, that Appellant shot Tyrone Smith in retaliation for the murder of his uncle. Police officers testified that between February and July of 1995, the atmosphere on the "north side" of Gallatin had been extremely tense and all police officers were on alert.

A large scale search for the appellant was conducted after the shootings. Following unsuccessful attempts to locate appellant in Gallatin, authorities received information that he could be located at a private residence in Sheffield, Alabama. On July 25, 1995, detectives from Sumner County observed Appellant at the residence, but were unable to arrest him at that time. [FN3] Appellant was finally apprehended on September 14, 1995 outside Cincinnati, Ohio as a result of a routine traffic stop.

FN3. Rearno Vaughn was apprehended a short distance from the Alabama residence and indicated that appellant was in the house. However, police were unable to locate him and determined that he fled out the back door of the home.

Two weapons were found in the attic of the Alabama residence: a Smith and Wesson .357 Magnum and a .38 caliber snub-nosed pistol. Using expended shell casings from the crime scene, [FN4] ballistics testing disclosed that the seized .357 Magnum had been used in the shootings. Four other fired cartridge casings recovered at the scene were all fired from the same .45 caliber weapon, but no weapon of that caliber was submitted for comparison purposes. [FN5] Testing performed on Ardell Williams' clothes revealed that two of his gunshot wounds resulted from contact shots, meaning the muzzle was either touching the garment or less than three inches away.

FN4. That evidence consisted of five Winchester brand .357 cartridge cases found near the scene, four nickel-plated .357 metal bullet jackets, and one hollow point .357 nickel-plated metal jacket bullet removed from Chris Williams.

FN5. In addition, three .45 caliber full metal case bullets and one bullet fragment submitted for testing could not be identified to determine whether they were fired through same weapon.

Appellant submitted alibi proof from his girlfriend's sister. Monica Eason stated that she saw appellant at "Club Malibu" in Nashville on July 2, 1995 between 1:00 and 1:30 a.m. Appellant also introduced proof that it would take approximately thirty-six minutes to drive from Club Malibu in Nashville to Wing Its in Gallatin. In addition, [A]ppellant presented proof to contradict a State's witness who testified to speaking with appellant and Rearno Vaughn immediately after the shooting. In rebuttal, the State introduced testimony that Monica Eason had earlier told a police detective that she saw appellant at Club Malibu around 12:00 a.m. on July 2, 1995.

Based upon the foregoing evidence, the jury convicted appellant of first degree premeditated murder of Tyrone Smith, attempted first degree murder of Ardell Williams, attempted second degree murder of Tallis Bonds, attempted second degree murder of Chris Williams, and felony reckless endangerment. Appellant automatically received a life sentence for the first degree murder conviction. At a subsequent sentencing hearing, [A]ppellant received twenty-two years for the attempted first degree murder, twelve years on each count of attempted second degree murder, and two years for the reckless endangerment conviction. Those sentences were ordered to be served concurrently to one another, but consecutive to the life sentence.

State v. James Alfonso Vaughn a/k/a Fuzz, No. 01C01-9612-CR-00523, 1998 WL 255438, at *1-3 (Tenn. Crim. App., at Nashville, May 21, 1998), *perm. app. denied* (Tenn. Jan. 25, 1999).

On February 1, 1999, J. Vaughn filed a pro se petition for post-conviction relief, which was later amended multiple times by appointed counsel. The amended petition alleged, in pertinent part, that J. Vaughn's trial counsel was ineffective by: (1) failing to object to the trial court's instruction to the jury that deliberation was an element of first degree murder; (2) failing to object to the trial court's instruction on the definition of "knowingly"; (3) failing to object to or appeal the trial court's instruction to the jury about the minimum release eligibility date for the first degree murder offense; and (4) failing to adequately prepare for trial by failing to view the area of the house where the gun was found by police and by failing to interview witnesses regarding this evidence. Further, J. Vaughn asserted that his trial counsel's ineffectiveness prejudiced him.

–4–

The following evidence relevant to J. Vaughn's claims was presented at the hearing on his petition for post-conviction relief:[2] Walter Stubbs ("Counsel Stubbs") testified that he was appointed to represent J. Vaughn in his defense against multiple charges, the most serious of which was a first degree murder charge. He said that his theory of the case was that J. Vaughn did not commit any of these crimes, and he attempted to prove that J. Vaughn was never in Alabama, where the murder weapon was found, after the murders occurred. Counsel Stubbs said that identification was one of the biggest issues, and he attacked the State's witnesses who testified that J. Vaughn was at the scene when these crimes occurred. Counsel Stubbs said that, based on what J. Vaughn told him, J. Vaughn was not in Alabama at the time that the gun was found, and he mounted his defense upon that fact. Counsel Stubbs said that he did not file a motion to suppress the gun found in Alabama because, again, J. Vaughn said that he was not there. Counsel Stubbs said that he discussed with J. Vaughn the fact that he could not file a motion to suppress the gun if J. Vaughn was never in Alabama because he would not have standing to do so. Counsel Stubbs said that he told J. Vaughn what the potential defenses could be if he either was, or was not, in Alabama where the gun was found, and J. Vaughn maintained that he was not in Alabama. Counsel Stubbs explained that the "linchpin" of the defense was that J. Vaughn was not in Alabama, and he was not connected to the gun. Counsel Stubbs said that, in his closing arguments, he asserted to the jury that there was reasonable doubt that J. Vaughn was ever in Alabama. Counsel Stubbs stated that he never went to the house in Alabama where the gun was found. Counsel Stubbs testified that the police were unable to link one of the two guns found in Alabama to the crimes in Tennessee, and, therefore, it could have possibly been excluded on relevancy grounds, but Counsel Stubbs did not feel that this was particularly significant considering his theory of the case.

Counsel Stubbs testified that he was aware that there were two witnesses who would testify that J. Vaughn was in Alabama. He was also aware that the trial court had ruled that R. Vaughn's statements to police that J. Vaughn was in the house in Alabama were admissible. Counsel Stubbs said that he specifically told J. Vaughn that there were three people that would link J. Vaughn to Alabama, but J. Vaughn maintained that he was never in Alabama.

Counsel Stubbs said that he tried to interview each and every witness listed on the indictment, but there was at least one witness that he did not get to talk to until the day of J. Vaughn's trial. Counsel Stubbs asked J. Vaughn if any of his relatives in Alabama would testify that he was not there at the time that the weapon was discovered, and J. Vaughn told Counsel Stubbs that he would call them to see if they would be willing to testify. Counsel Stubbs said

[2]The post-conviction court held one hearing on both J. Vaughn's and R. Vaughn's petitioner for post-conviction relief. R. Vaughn has also appealed the post-conviction court's denial of his petition to this Court. We are issuing separate opinions in each of the appeals, but many of the facts and witnesses that were presented at the post-conviction hearing are the same in both appeals. Accordingly, we refer to the parties involved in a manner that will be clear in both opinions.

that, as the trial got closer, J. Vaughn told Counsel Stubbs that he did not want any of his Alabama relatives involved in this case, and he did not want Counsel Stubbs to contact them about testifying. Counsel Stubbs testified that he attempted to contact all the witnesses in this case, and he asked J. Vaughn if there were any witnesses who would testify on J. Vaughn's behalf. Counsel Stubbs said that he spent over 200 hours on this case.

Counsel Stubbs testified that he talked with Sammy Alexander, whom Counsel Stubbs was going to use to impeach Keith Goodrich, one of the State's witnesses who identified R. Vaugh as being at the scene of the murder. Goodrich testified that, on the night of the shooting, R. Vaughn pointed a gun at him and attempted to shoot him, but the gun did not fire because it was empty. Alexander would have testified that Goodrich told him that the man who attempted to shoot Goodrich had a mask on, and Goodrich could not see his face. Alexander had previously been convicted of voluntary manslaughter, and Counsel Stubbs attempted to have the trial judge rule that this prior conviction could not be used to impeach Alexander. Counsel Stubbs said that he thought that there was some question in the judge's ruling about whether he would allow the State to ask questions about this prior conviction. Therefore, he made an offer of proof with Alexander's testimony, but he did not call Alexander to testify before the jury.

Counsel Stubbs testified that the search warrant that the police obtained, and executed, to search the Alabama house stated that the house was to be searched for the "body of James Vaughn." Counsel Stubbs testified that, at J. Vaughn's trial, the State offered testimony of a police officer that he heard an unidentified man say "Fuzz," which is J. Vaughn's alias. Counsel Stubbs objected to this testimony on hearsay grounds, the trial court overruled the objection, and on appeal this Court held that the trial court committed error, but the error was harmless. Counsel Stubbs testified that he never went to Alabama to view the location where police heard the statement to ensure that the police officer's testimony was accurate.

Counsel Stubbs said that he reviewed the jury instructions prior to trial, and, at that time, the instructions appeared to comport with the law. The jury was instructed that, if the jury found J. Vaughn guilty of first degree murder, the trial court would impose a sentence of life in prison, which carried a minimum of twenty-five calendar years. Counsel Stubbs said that he subsequently learned that Tennessee Code Annotated section 40-35-501 changed the release eligibility date for persons convicted of committing first degree murder and sentenced to life in prison with the possibility of parole from twenty-five years to fifty-one years. He said that the change was not made clear until the release of an opinion from the Attorney General's Office sometime after J. Vaughn's trial. Counsel Stubbs said that neither he, the judge, nor the prosecutor knew that this statute changed the release eligibility date.

On cross-examination, Counsel Stubbs said that he filed a motion in opposition to the consolidation of J. Vaughn's trial with R. Vaughn's trial, and he was successful on this motion. He said that he also filed a motion to exclude an excited utterance and a dying declaration, both

of which were granted by the trial court. Counsel Stubbs said that he filed a number of other motions, some of which were granted. Counsel Stubbs said that he reviewed the entire police file, and he interviewed most of the police officers involved. In addition, he interviewed all of the State's witnesses, except one. Counsel Stubbs said that J. Vaughn specifically instructed him that J. Vaughn did not want any of his relatives to be called as witnesses.

Counsel Stubbs testified that he requested some jury instructions, and he reviewed the instructions that the judge said he was going to give to the jury. Counsel Stubbs said that he did not focus on the mens rea instruction because his theory of the case was that J. Vaughn was absent from the scene of the crime, not that he did not have the requisite mental state. With regard to the sentencing instruction, Counsel Stubbs said that he reviewed the proposed instruction and the statute, and he determined that they "appeared to be consistent with each other." He said that the issue about the release eligibility date was not brought to light until the Attorney General issued an advisory opinion on July 1, 1997, which was almost a year after he filed the appeal in this case.

Roger A. Sindle ("Counsel Sindle") testified that he represented R. Vaughn. Counsel Sindle said that he discussed R. Vaughn's case with Counsel Stubbs. He said that he and Counsel Stubbs discussed that both of their clients had instructed them not to involve their Alabama relatives in the defense of these cases. Counsel Sindle said that he and Counsel Stubbs had numerous conversations about how Counsel Stubbs was going to approach his case, and the motions that he was going to file. He said that he and Counsel Stubbs discussed other suspects in the crime.

Steven Keith Bearden, an Alabama State Trooper, said that he testified in the trials of both R. Vaughn and J. Vaughn, and also in the motion to suppress hearing. Trooper Bearden said that he was involved in the search of the Alabama house where the weapons in this case were found on July 25, 1995. He said that, during the search, he was looking for J. Vaughn, and he searched the attic for him. The trooper testified that the entrance to the attic was inside a closet, and he climbed into the hole with another detective's assistance. The trooper said that he entered the attic, which was a relatively low attic with a crawl space, and he immediately saw two handguns. The trooper handed the two guns to the other officers, and he then continued to search the attic using a flashlight. The trooper identified photographs of the entrance to the attic.

On cross-examination, the trooper said that the search of the Alabama house began shortly after 9:00 p.m. He said that there were multiple officers present, and each officer was assigned a specific area of the house to search. The trooper testified that he could not stand inside the attic, but there was enough room for a person to be hiding. Trooper Bearden said that he did not search any drawers, and he did not overturn a mattress during the search. The trooper did not have any information about whether J. Vaughn lived in Alabama, and the only information he had was that there were murder suspects that were believed to be in Sheffield,

Alabama and that a search warrant had been obtained. The trooper said that he is 6'1" and weighs 170 pounds.

Sammy Alexander testified that he encountered Keith Goodrich in the hospital immediately after the shooting. Alexander said that Goodrich approached him and asked him if he had a gun for sale. Alexander told Goodrich that he did not have a gun for sale, and then he asked Goodrich why Goodrich wanted a gun, and Goodrich responded "I don't know . . . they had a ski mask on." Alexander said that he testified at J. Vaughn's trial, and, at trial, his testimony was that Goodrich said "I don't know man. Them nig**** had ski masks on them, but it had to be Fuzz and them." Alexander said that he told Counsel Stubbs about his prior record. On cross-examination, Alexander testified that, as a juvenile, he was convicted of voluntary manslaughter.

Brenda Fay Vaughn Freeman testified that she was renting the house that was searched in Sheffield, Alabama at the time that the search warrant in this case was executed, and she had lived there for four or five years. She said that R. Vaughn is her brother, and he had come to visit her ten days prior to the search. She said that R. Vaughn's mother knew that he was visiting her, and he had his own room in the house that he would stay. Freeman testified that R. Vaughn and J. Vaughn shared a key to the home, and they both had their own beds in the home. She said that J. Vaughn had previously spent the summer at her house. Freeman said that J. Vaughn was not at her house on the day that it was searched.

Freeman testified that the house was a single story house. She said that there was a closet in the house that had a small opening to the attic, which had previously been used as a chimney with an exhaust stack that went up through the attic. At the time of the search, she stored tools, an ax, a sling blade, and a wagon in the closet. Freeman said that, the night of the search, R. Vaughn had been at Freeman's daughter's house and to the grocery store. She said that, when R. Vaughn and Freeman's daughter brought the groceries to the house at around 5:00 p.m., the police pulled up and told R. Vaughn to stop. The police arrested R. Vaughn, and then returned around 9:00 p.m. with a search warrant for the home. Freeman said the search lasted approximately forty-five minutes, and her house looked "[l]ike a tornado" had gone through it when the police were done. She said that all of the mattresses were off of the beds, and all of contents of the drawers were lying on the floor. Freeman said that all of the items in the closet with the chimney hole to the attic were undisturbed.

Freeman testified that Counsel Stubbs never contacted her. Freeman said that she would have been willing to talk to him, and she would have testified at J. Vaughn's trial. Freeman said that she had never seen either of the guns that were confiscated by police in her home. She said that she never told either R. Vaughn or J. Vaughn that she did not want to talk to their lawyers.

On cross-examination, Freeman said that R. Vaughn and J. Vaughn came down to visit her together. She said that J. Vaughn was staying with her when the search warrant was executed, but he had gone to visit a friend when the search warrant was executed. She said that J. Vaughn was living at her house on July 25, 1995, as was her son, George Simpson. Freeman testified that neither J. Vaughn nor R. Vaughn went into her attic and neither could fit in the attic. Freeman said that she returned to Tennessee at least five times during the time from the Vaughns' arrest until their trials. On those occasions, she never attempted to see either J. Vaughn or R. Vaughn, and she never contacted either of their attorneys.

George E. Simpson, Jr., testified that Freeman is his mother, and, on July 25, 1995, he was twenty-two and was living with his mother in Sheffield, Alabama. Simpson testified that the house was approximately 1000 square feet and that it had four bedrooms, a kitchen, a living room, and a bathroom. Simpson identified pictures of the hole in the closet ceiling that goes to the attic. He said that the hole used to be a chimney, and that, to get to the hole, you had to remove garden tools, sling blades, a wagon and bikes. Simpson testified that the hole measured thirteen inches by fifteen inches. He said that approximately six officers searched the home, and the search lasted between forty-five minutes and one hour. Simpson said that he was never contacted by Counsel Stubbs, and he said that, had he been contacted, he would have testified on J. Vaughn's behalf. On cross-examination, Simpson said that R. Vaughn and J. Vaughn came together to visit Simpson and his mother. He said that, when R. Vaughn was arrested, J. Vaughn was at a different house in the area. He said that he never saw the guns that the officers found, and he was unaware that there were any guns in the house.

R. Vaughn testified that he was arrested in Alabama on July 25, 1995, and he had been there for eight to ten days. He said that J. Vaughn came with him to Alabama and that they were staying together at the Freeman's house. R. Vaughn said that he did not know where J. Vaughn was when R. Vaughn was arrested, but, at that time, they were still staying at Freeman's house together. He also testified that he had never been in the attic of Freeman's house, and he did not know anything about the guns. R. Vaughn said that he did not know whether J. Vaughn put anything in the attic.

J. Vaughn testified that he is currently serving a life sentence, and Counsel Stubbs represented him in his case. He said that he did not tell Counsel Stubbs that he was not in Alabama, rather he told him that he was not at the house when it was searched. He said that he gave Counsel Stubbs the telephone number of his Alabama relatives, including Freeman, because he wanted Counsel Stubbs to contact them. He denied that he ever told Counsel Stubbs not to contact his Alabama relatives. J. Vaughn testified that Counsel Stubbs told him that the State was going to offer the testimony of two detectives who would testify that, when R. Vaughn was arrested, R. Vaughn said that J. Vaughn was in the Alabama house. Counsel Stubbs also told him that there was a .357 gun confiscated in the Sheffield, Alabama house that was going to

be used as evidence against J. Vaughn. J. Vaughn said that he was not in the Alabama house when it was searched because he had left earlier that day.

J. Vaughn testified that Counsel Stubbs told him that he was facing a life sentence and that a life sentence was twenty-five years. J. Vaughn said that he wanted Alexander to testify, and the jury never heard Alexander's testimony because Counsel Stubbs only presented this testimony in an offer of proof. J. Vaughn said that he never went over the jury instructions with Counsel Stubbs. He said that he is 6'2" tall and weighs 215 pounds. J. Vaughn said that he gave Counsel Stubbs the names of three or four alibi witnesses.

On cross-examination, J. Vaughn said that he was in Sheffield, Alabama on the day that R. Vaughn was arrested, and, at the time of the arrest, he was visiting a female friend. He said that he spent the night at the female friend's house, and he left Alabama the next day. J. Vaughn said that he knew that R. Vaughn had been arrested, but he did not know that there was a warrant out for his own arrest. He said that he never told the police or Counsel Stubbs that he was not in Alabama on the day of the arrest. J. Vaughn said that, the day after R. Vaughn was arrested, he read about the arrest in the newspaper. He could not recall whether the newspaper said that there was a warrant out for his arrest. He said that he then left Alabama and drove to Tennessee. He did not recall when he left Tennessee to go to Ohio, where he was eventually arrested. He said that he went to Ohio to visit another female friend, and he stayed with her in Cincinnati for approximately one month. J. Vaughn testified that he did not speak with the detectives on the way from Cincinnati to Tennessee. He said that he never entered the crawl space in the Alabama home.

Susan Morrow, a detective with the Gallatin Police Department, testified that, in September of 1995, over two months after the shooting in this case, she went to Cincinnati, Ohio, to bring J. Vaughn back to Tennessee. The detective said that she transported J. Vaughn in an unmarked police car, and, while driving, he told her that he was never in Sheffield, Alabama. On cross-examination, the detective testified that the casings from the .45 handgun found in the Sheffield, Alabama house did not match the casings from the .45 used in the shooting.

Based upon this evidence, the post-conviction court dismissed J. Vaughn's petition for post-conviction relief, and J. Vaughn now appeals.

## II. Analysis

On appeal, J. Vaughn contends that the post-conviction court erred when it dismissed his petition because Counsel Stubbs failed to: (1) object to the trial court's instruction to the jury that deliberation was an element of first degree murder; (2) object to the trial court's jury instruction regarding the mens rea of "knowingly"; (3) object to or appeal the trial court's instruction to the jury about the minimum release eligibility date for first degree murder; and (4)

−10−

adequately prepare for trial by failing to view the area of the house where the gun was found by police and by failing to interview witnesses regarding this evidence. Further, J. Vaughn asserted that his trial counsel's ineffectiveness prejudiced him.

In order to obtain post-conviction relief, a petitioner must show that his or her conviction or sentence is void or voidable because of the abridgment of a constitutional right. Tenn. Code Ann. § 40-30-103 (2003). The petitioner bears the burden of proving factual allegations in the petition for post-conviction relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). A post-conviction court's factual findings are subject to a de novo review by this Court; however, we must accord these factual findings a presumption of correctness, which is overcome only when a preponderance of the evidence is contrary to the post-conviction court's factual findings. Fields v. State, 40 S .W.3d 450, 456 (Tenn. 2001). A post-conviction court's conclusions of law are subject to a purely de novo review by this Court, with no presumption of correctness. Id. at 457.

The right of a criminally accused to representation is guaranteed by both the Sixth Amendment to the United States Constitution and Article I, section 9, of the Tennessee Constitution. State v. White, 114 S.W.3d 469, 475 (Tenn. 2003); State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). This right to representation includes the right to "reasonably effective" assistance. Burns, 6 S.W.3d at 461. The Tennessee Supreme Court has held that the issue of ineffective assistance of counsel is a mixed question of law and fact and, as such, is subject to a de novo review. Id.

In reviewing a claim of ineffective assistance of counsel, this Court must determine whether the advice given or services rendered by the attorney are within the range of competence demanded of attorneys in criminal cases. Baxter, 523 S.W.2d at 936. To prevail on a claim of ineffective assistance of counsel, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness," Strickland v. Washington, 466 U.S. 668, 688 (1984), and that this performance prejudiced the defense, resulting in a failure to produce a reliable result. Id. at 687; Cooper v. State, 849 S.W.2d 744, 747 (Tenn. 1993). To satisfy the requirement of prejudice, a petitioner must show a reasonable probability that, but for counsel's unreasonable error, the fact finder would have had reasonable doubt regarding the petitioner's guilt. Strickland, 466 U.S. at 695. This reasonable probability must be "sufficient to undermine confidence in the outcome." Id. at 694; see also Harris v. State, 875 S.W.2d 662, 665 (Tenn. 1994).

When evaluating an ineffective assistance of counsel claim, the reviewing court should judge the attorney's performance within the context of the case as a whole, taking into account all relevant circumstances. Strickland, 466 U.S. at 690; State v. Mitchell, 753 S.W.2d 148, 149 (Tenn. Crim. App. 1988). The reviewing court must evaluate the questionable conduct from the attorney's perspective at the time. Strickland, 466 U.S. at 690; Cooper, 849 S.W.2d at 746;

Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982). In doing so, the reviewing court must be highly deferential and "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462. Counsel should not be deemed to have been ineffective merely because a different procedure or strategy might have produced a different result. Williams v. State, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980). The fact that a particular strategy or tactic failed or hurt the defense does not, standing alone, establish unreasonable representation. House v. State, 44 S.W.3d 508, 515 (Tenn. 2001) (citation omitted); Thomas Brandon Booker v. State, No. W2003-00961-CCA-R3-PC, 2004 WL 587644, at *4 (Tenn. Crim. App., at Jackson, Mar. 24, 2004), *perm. app. denied* (Tenn. June 21, 2004). However, deference to matters of strategy and tactical choices applies only if the choices are informed ones based upon adequate preparation. House, 44 S.W.3d at 515.

### A. Failing to Object to Jury Instructions
### 1. Deliberation Instruction

The Petitioner alleges that Counsel Stubbs was ineffective by failing to object to the trial court's instruction to the jury that deliberation was an element of first degree murder. The trial court instructed the jury as follows:

> First-degree murder. Any person who commits the offense of first-degree murder is guilty of a crime.
>
> For you to find the defendant guilty of this offense the State must have proven beyond a reasonable doubt the existence of the following essential elements:
>
> (1) That the defendant unlawfully killed the alleged victim; and,
> (2) That the defendant acted intentionally. A person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result; and,
> (3) That the killing was deliberate. A deliberate act is one performed with a cool purpose; and,
> (4) That the killing was premeditated.
>
> A premeditated act is one done after the exercise of reflection and judgment. Premeditation means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill preexists in the mind of the accused for any definite period of time. It is sufficient that it preceded the act, however short the interval, as long as it was the result of reflection and judgment.

−12−

When deciding whether Counsel Stubbs failure to object to this jury instruction entitled J. Vaughn to post-conviction relief, the post-conviction court found:

> This shooting occurred on July 2, 1995. The law changed on July 1, 1995 . . . . T.C.A. 39-13-202, First Degree Murder was amended by the legislature and the element of deliberation was removed. First degree murder was now defined as "The premeditated and intentional killing of another.["] The other parts of the statute are irrelevant for the purpose of this discussion. Prior to July 1, 1995, the definition of First Degree Murder was "the intentional, premeditated and deliberate killing of another." The Court, in its jury instruction used the pre-July 1, 1995 definition and instructed the jury on deliberation as well as intentional and premeditated.
>
> The elements were defined and in no part of the jury instruction does it state that "intent or design to kill may be conceived and deliberately formed in an instant" which instruction was abolished in St. of Tn. v. Brown, 836 S.W.2d 530 (Tenn. 1992). The jury instruction given in this case properly defined the elements of "intentional and premeditated" and this Court finds that the inclusion of the definition of "deliberate" is harmless under the circumstances of this case. Further, the case was appealed to the Tennessee Court of Criminal Appeals on a sufficiency of evidence claim and the Court of Appeals held that the record amply established the elements of premeditation and intent. The Court of [Criminal] Appeals stated,
>
>> "Evidence that the appellant was armed with a gun and hiding behind a trailer to watch a group known to be his enemies, support the jury's finding of premeditation. When viewed together with the additional proof that the victim's brother had murdered appellant's uncle five moths earlier, we conclude that the evidence supports a finding of both premeditation and intent."
>
> This Court does not find that counsel was ineffective for failing to raise the "deliberation" issue.

On appeal, J. Vaughn contends that the post-conviction court erred when it found that he was not entitled to relief on this issue because the addition of "deliberation" could have confused the jury. We have previously held that the inclusion of the word "deliberately" in the context of an indictment would not have lowered the State's burden of proof, but would have in fact increased the State's burden, stating:

[C]ommon sense belies the appellant's argument that the grand jury would have indicted the appellant for a premeditated, intentional and deliberate killing, but would not have indicted him for a premeditated and intentional one. If anything, the additional element of "deliberately" created a higher burden for the state to overcome in order to secure an indictment against the appellant for first degree murder. Accordingly, any error in the grand jury process caused by the addition of "deliberately" in the indictment ran to the appellant's benefit, not his detriment.

State v. Stacy Allen Bullard, No. E1999-00796-CCA-R3-CD, 2000 WL 277314, at *4 (Tenn. Crim. App., at Knoxville, Mar. 15, 2000), *perm. app. denied* (Tenn. Sept. 11, 2000). In accordance with this analysis, we conclude that, while it may have been deficient for Counsel Stubbs to be unaware of this change in the law, J. Vaughn has not shown that this deficiency prejudiced him because any instructional error increased the State's burden of proof. Because he has not shown prejudice, J. Vaughn is not entitled to post-conviction relief. Therefore, this issue is without merit.

### 2. Knowingly Instruction

J. Vaughn also contends that Counsel Stubbs was ineffective by failing to object to the trial court's instruction on the mens rea of "knowingly" with respect to the second degree murder charge, citing State v. Page, 81 S.W.3d 781 (2002). With regard to second degree murder, the trial court instructed the jury:

Second-degree murder. Any person who commits second degree murder is guilty of a crime.

For you to find the Defendant guilty of this offense, the State must have proven beyond a reasonable doubt the existence of the following essential elements:

1. That the Defendant unlawfully killed the alleged victim; and
2. That the Defendant acted knowingly. Knowingly means that a person acts knowingly with respect to the conduct or the circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result.

The post-conviction court found "Page . . . was decided six years after the case at bar. The Court finds counsel was not ineffective because he did not raise Page issues. It is unfathomable to

think that all cases are to be retried if jury instructions do not comport with <u>Page</u>. The instructions given reflected the law and pattern instructions in effect in 1996."

We agree with the post-conviction court. In <u>Page</u>, this Court changed the law with respect to the definition of "knowingly," the required mens rea for second degree murder, holding that second degree murder is strictly a "result of conduct offense" and a jury instruction allowing a jury to convict on second degree murder based only "upon awareness of the nature of the conduct or circumstances surrounding the conduct" improperly lessened the State's burden of proof. <u>Id.</u> at 788. After this decision, there were multiple post-conviction petitions filed by petitioners alleging that their trial attorneys were ineffective for failing to appeal the issue decided in <u>Page</u>, even though their appeals were filed and decided prior to the release of the <u>Page</u> decision. In the face of this issue, in <u>Corwyn E. Winfield v. State</u>, No. W2003-00889-CCA-R3-PC, 2003 WL 22922272 (Tenn. Crim. App., at Jackson, Dec. 10, 2003), *perm. app. denied* (Tenn. May 10, 2004), this Court noted that, while it was arguable that appellate counsel could have anticipated the <u>Page</u> holding, counsel's performance was not deficient for failing to anticipate a change in the law with regard to the jury charge on the mens rea of "knowingly." <u>Id.</u> at *10. Similarly, in <u>Ernest B. Eady v. State</u>, No. E2002-03111-CCA-R3-PC, 2004 WL 587639 (Tenn. Crim. App., at Knoxville, Mar. 25, 2004), *perm. app. denied* (Tenn. Oct. 11, 2004), the Court concluded that the petitioner's trial counsel was not ineffective for failing to raise the "knowingly" issue on appeal because the first appellate decision reversing a conviction based upon an incorrect "knowingly" instruction was released shortly before this Court released the decision in Eady's direct appeal. <u>Id.</u> at *8. The <u>Eady</u> Court cited the Wisconsin Court of Appeals for the proposition that "'ineffective assistance of counsel cases should be limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue.'" <u>Id.</u> at *8 (citing <u>State v. McMahon</u>, 186 Wis.2d 68, 519 N.W.2d 621, 628 (Wis. Ct. App. 1994)). The <u>Page</u> decision was released almost six years after J. Vaughn's trial. We find our reasoning and analysis in <u>Winfield</u> and <u>Eady</u> to be persuasive, and we conclude that J. Vaughn has not met his burden of showing that Counsel's performance was deficient. This issue is without merit.

### 3. Release Eligibility Instruction

J. Vaughn next alleges that Counsel Stubbs was ineffective for failing to object to the trial court's instruction to the jury regarding the release eligibility date for a life sentence. The trial court instructed the jury, "The punishment for the offense of murder in the first degree is life imprisonment. Therefore, should you return a verdict of guilty, the court will impose a life sentence which carries a minimum of 25 calendar years." When deciding whether Counsel Stubbs was ineffective for failing to request a different jury instruction, or failing to appeal this instruction, the post-conviction court found:

−15−

The second change in the law effective July 1, 1995 was in release eligibility after conviction of First Degree Murder. On June 12, 1995, the Legislature passed Public Chapter 492 which amended T.C.A. 40-35-501 by adding subsection (i) which states in pertinent part that,

> "[T]here shall be no release eligibility for a person committing an offense on or after July 1, 1995, that is enumerated in subpart (2) of this subsection. Such person shall serve 100% of the sentence imposed by the Court less sentence credits earned and retained. Provided, however, no sentence reduction credits authorized by T.C.A. 41-21-238 or any other provision of the law shall operate to reduce the sentence imposed by the Court of more than 15%.

Prior to the passage of Public Chapter 492, release eligibility of a defendant sentenced to life was governed by T.C.A. 40-35-501(h)(1). This section required that,

> "[R]elease eligibility for each defendant receiving a sentence of imprisonment for life for First Degree murder shall occur after service of 60% of 60 years less sentence credits earned and retained by the defendant, but in no event shall a defendant sentenced to imprisonment for life be eligible for parole until the defendant has served a minimum of twenty-five (25) full calendar years of such sentence, notwithstanding the governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, or any sentence reduction credits authorized by § 41-21-236, or any other provision of law relating to sentence credits. A defendant receiving a sentence of imprisonment for life for first degree murder shall be entitled to earn and retain such sentence credits, but such credits shall not operate to make such defendant eligible for release prior to the service of twenty-five (25) full calendar years."

Public Chapter 492 created obvious confusion and uncertainty since the Legislature did not repeal T.C.A. 40-35-501(h)(1), and the two sections of the statute conflicted. The application of Public Chapter 492 remained uncertain until 1997 when the Attorney General cleared up the dilemma by stating that since the application of the amendment was unclear it was necessary to look at legislative intent. Specifically, the Attorney General's Opinion said,

"Since the amendment's application is unclear in this regard, the legislative intent is helpful in giving the intended effect to the law. Woodruff v. City of Nashville, 183 Tenn. 483, 192 S.W.2d 1013, 1015 (Tenn. 1946). The House Judiciary Committee specifically stated that the intent of the act, in so far as a life sentence for first degree murder is concerned, was to raise the already-existing floor of time to be served as provided in § 40-35-501(h)(1), from 60% to 100% of the sixty years. Special Report to the House Judiciary Committee, Tape #1, May 3, 1995 at 672. In addition § 40-35-501(h)(1), requires that a twenty-five year minimum "floor" must be served before a defendant sentenced to life for first degree murder become[s] eligible for any consideration of release eligibility. As the foregoing discussion points out, this conflicts with both the language and intent of sub-section (i), which was intended to raise the floor for release eligibility. When there is a conflict which cannot be resolved, long established rules of statutory construction provide that the most recently enacted statute repeals by implication any irreconcilable provisions of the former act. Tennessee-Carolina Transportation, Inc. v. Pentecost, 362 S.W.2d 461, 211 Tenn. 72 (1962). Since there is no way to reconcile the conflict, it is the opinion of this Office that Tenn. Code Ann. § 40-35-501(h)(1) has been repealed by implication by the enactment of Public Chapter 492, only to the extent that they conflict. American City Bank v. Western Auto [Supply], 632 S.W.2d 410, 428 (Tenn. [Ct.] App. 1981). The only reasonable resulting interpretation would be that subsection (i) operates, in so far as it conflicts with the provisions of the existing statute governing release eligibility, to raise the floor from 60% of sixty years (the arbitrary number of years for the purpose of calculating release eligibility), to 100% of sixty years, reduced by not more than 15% of eligible credits.

At the trial in May of 1996 the trial court instructed on the law that was on the books at that time. The Court cannot find that counsel was ineffective for not asking for another jury instruction when the applicability of the amendment was so unclear that two years after the enactment of Public Chapter 492 the Attorney General had to go behind the wording of the statute itself and look to legislative intent. The Court is mindful of the unreported case of State v. Milam . . . . In that case there was a question of whether the killing was accidental or intentional, and the Court held that the jury verdict might have been different if 51 years incarceration instead of 25 years had been known to the jury and it was remanded

for a new trial. That was, however, not a post-conviction case. The issue in the case at bar was one of identity and the proof on that issue was strong. Four eyewitnesses identified the defendant as one of the shooters. Once the identity of the defendant was established to the jury's satisfaction, it is without the realm of possibility that if the Court had instructed on the release eligibility of 51 years instead of 25 years that the jury would have convicted of a lesser included offense. As stated above, the Court of [Criminal] Appeals has already determined that the proof in the record amply supports that this was a premeditated and intentional killing.

J. Vaughn asserts that the post-conviction court erred when it found that he was not entitled to post-conviction relief on this ground. He asserts that this Court has acknowledged that his earliest release eligibility date is fifty-one years rather than twenty-five years. As such, J. Vaughn asserts that Counsel Stubbs' failure to request such an instruction, or to appeal this issue, constitutes ineffective assistance and that he was prejudiced by this deficiency. The State counters that the law with regard to release eligibility dates for a first degree murder sentence was unclear at the time of J. Vaughn's trial and appeal, and, therefore, Counsel Stubb's failure to request or appeal this instruction cannot be said to be deficient. We agree with the State.

J. Vaughn requested that the trial court instruct the jury on the earliest release eligibility date pursuant to Tennessee Code Annotated section 40-35-201(b),[3] which provides that "upon the motion of either party, filed with the court prior to the selection of the jury, the court shall charge the possible penalties for the offense charged and all lesser included offenses." When such a charge is requested by either party, section (b)(2)(A)(i) provides:

> When a charge as to possible penalties has been requested pursuant to subdivision (b)(1), the judge shall also include in the instructions for the jury to weigh and consider the meaning of a sentence of imprisonment for the offense charged and any lesser included offenses. Such instruction shall include an approximate calculation of the minimum number of years a person sentenced to imprisonment for the offense charged and lesser included offenses must serve before reaching such person's earliest release eligibility date. Such calculation shall include such factors as the release eligibility percentage established by § 40-35-501, maximum and minimum sentence reduction credits authorized by § 41-21-236 and the

---

[3]We note that effective May 18, 1998, the Legislature amended Tennessee Code Annotated section 40-35-201, deleting subsection (b) and replacing it with a new provision that provides that juries in noncapital cases shall not be instructed on the possible penalties for the offense charged or lesser-included offenses. This amendment does not apply to cases tried before the effective date of the amendment. 1998 Tenn. Public Acts ch. 1041 § 2.

governor's power to reduce prison overcrowding pursuant to title 41, chapter 1, part 5, if applicable.

At the time of the Petitioner's trial, May of 1996, there were three statutes that mandated two different release eligibility dates for persons convicted of first degree murder. The first, Tennessee Code Annotated section 40-35-501(g)(1) (Supp. 1993), stated:

> Release eligibility for each defendant receiving a sentence of imprisonment for life for First Degree murder shall occur after service of 60% of 60 years less sentence credits earned and retained by the defendant, but in no event shall a defendant sentenced to imprisonment be eligible for parole until defendant has served a minimum of twenty-five (25) full calender years of such sentence. . . . A defendant receiving a sentence of imprisonment for life for first degree murder shall be entitled to earn and retain such sentence credits, but such credits shall not operate to make such defendant eligible for release prior to the service of twenty-five (25) full calendar years."

Similarly, Tennessee Code Annotated section 39-13-204 required that the jury be instructed that a defendant receiving a life sentence will not be eligible for parole consideration until the defendant has served "at least twenty-five (25) full calendar years of such sentence." Tenn. Code Ann. § 39-13-204(e)(2) (Supp. 1993). However, effective July 1, 1995, Tennessee Code Annotated section 40-35-501(i), made applicable to a person convicted of committing a first degree murder on or after July 1, 1995, stated that "[s]uch person shall serve 100% of the sentence imposed by the Court less sentence credits earned and retained. Provided, however, no sentence reduction credits authorized by T.C.A. 41-21-238 or any other provision of the law shall operate." This statute did not repeal section 40-35-501(g)(1). It was later interpreted, however, to mean that the earliest release eligibility date for a person convicted of first degree murder was fifty-one years, which is 85% of sixty years. See State v. Charles Golden, No. 02C01-9709-CR-00362, 1998 WL 518071, at *7 (Tenn. Crim. App., at Jackson, Aug. 21, 1998), *no perm. app. filed* (citing Attorney General Opinion 97-098 (7-1-97)); see also Drummer v. State, 6 S.W.3d 520, 522 (Tenn. Crim. App. 1999).

The Tennessee Supreme Court dealt with the issue of improper jury instructions regarding the range of punishment in State v. Cook, 816 S.W.2d 322 (Tenn. 1991). In Cook, the issue before the Court was whether a trial judge committed prejudicial error by instructing the jury on the range of punishment for a Range I offender, where the sentence range under which the defendant must be sentenced is that of a Range II offender. Id. at 324. The Court assumed that the trial court committed error when it instructed the jury and then turned to decide whether that error was harmless. Id. at 325. It concluded that Tennessee Code Annotated section 40-35-

–19–

201(b)[4] gave a defendant a claimable statutory right to have the jury know the range of punishment. The Court went on to conclude that the benefits that the Legislature had in mind for the defendant when it passed this statute would be lost if the defendant were "to be sentenced to punishments greater than what the jury finding guilt was instructed would be imposed." Id. at 327. Further, "to deny this defendant that statutory right constitutes prejudice to the judicial process, rendering the error reversible . . . ." Id.

In contrast, in 1995, this Court addressed an issue similar to the issue addressed by our Supreme Court in Cook. See State v. Smith, 926 S.W.2d 267 (Tenn. Crim. App. 1995). In Smith, the defendant complained that the trial court improperly instructed the jury about a Range I punishment when he was subsequently sentenced as a Range II offender. This Court held, "Whether the defendant qualified as a Range I or Range II offender depended upon the proof offered at any subsequent sentencing hearing. Thus, the jury was aware of the possible range of punishment that could have resulted from their verdict." Id. at 271. The Court distinguished the case before it from Cook by stating that in Cook "the only possible sentence was actually within Range II" in Cook whereas in Smith the possible sentence included a Range I sentence, depending on the proof at the sentencing hearing. Id.

In Golden, the defendant's trial was held from May 17 to May 19 of 1997. Golden, 1998 WL 518071, at *1. The defendant was charged and convicted of first degree murder. Id. The jury was to determine the defendant's sentence, and the trial court instructed the jury that if it sentenced the defendant to life with the possibility of parole, the defendant would be eligible for parole after serving a minimum of twenty-five years. Id. at *7. The jury sentenced the defendant to life without the possibility of parole. Id. at *1. On appeal, we held that Tennessee Code Annotated section 40-35-501(i) mandated that the defendant serve a minimum sentence of fifty-one years, and, therefore, the trial court erred when it instructed the jury. Id. at *7-8. We stated:

> It immediately becomes apparent that the legislature in 1995 overlooked amending Tennessee Code Annotated § 39-13-204 to coincide with the 1995 amendment to Tennessee Code Annotated § 40-35-501. The statutes presently are in conflict; however, it is clear that the legislature intended to change the minimum release eligibility date for a life sentence from twenty-five (25) years to fifty-one (51) years.

Id. at *8. The Court then held that, since the homicide at issue had occurred after July 1, 1995, "the trial court erred in informing the jury of the twenty-five (25) year provision instead of the

---

[4]This is the same statute used by J. Vaughn in this case to request that the jury be instructed on the range of punishment.

−20−

fifty-one (51) year provision." Id. The Court went on to conclude that the error was not harmless beyond a reasonable doubt, and we remanded the case for a new sentencing hearing.

In State v. Reco R. Douglas, No. 02C01-9711-CR-00443, 1998 WL 803410 (Tenn. Crim. App., at Jackson, Nov. 20, 1998), *no perm. app. filed*, the Court again addressed whether a trial court erred when it instructed the jury on release eligibility dates. The defendant was charged and convicted of first-degree felony murder on December 3, 1994. The trial court instructed the jury that, if it sentenced the defendant to life with the possibility of parole, the defendant would be eligible for parole in less than two years, when, in fact, the defendant would have to serve a minimum of twenty-five years. Id. at *2.[5] The Douglas Court distinguished the case before the Court from Smith, stating that, at the time of the Smith trial, the sentencing status of the defendant had "not been established and the [S]tate's proof for a higher range may fail. In other words, in those cases, the instructed minimum sentence is still a possibility." Id. The Court then held that, in the case before it, *at the time of trial* the defendant was ineligible for parole before serving twenty-five years. Id. The Court cited Cook for the proposition that "'[i]t is widely perceived by those who observed the operations of our trial courts in previous times, when juries had the additional responsibility of setting punishment, that often they seemed to find guilt of a crime not necessarily most strongly suggested by the evidence, but one the punishment for which suited their sense of justice in that case.'" Id. (citing Cook, 916 S.W.2d at 326). The Court held that the instruction misled the jury, and it reversed and remanded the case for a new trial.

In State v. Meyer, 994 S.W.2d 129 (Tenn. 1999), the Tennessee Supreme Court reversed and remanded a case for a new trial where the defendant was convicted of two counts of rape of a child after the jury was erroneously instructed that he would have to serve, if convicted, at least 5.73 years, rather than the entire sentence undiminished. Id. at 132. The Supreme Court held that the defendant was prejudiced by the erroneous jury instruction and that it was conceivable that the defendant would have been convicted of a lesser offense had the jury known that he would not have been eligible for early release. Id. at 131-32 (citing Cook, 816 S.W.2d at 322).

Our Court dealt with a similar issue in State v. Bryan A. Milam, No. 01C01-9712-CC-00557, 1999 WL 701419 (Tenn. Crim. App., at Nashville, Sept. 10, 1999), *no perm. app. filed*. In that case, the defendant was convicted of two counts of first degree murder for a crime he committed on May 15, 1996, and he was sentenced to life imprisonment for each count. Id. at *1. The trial court instructed the jury that, if convicted, the defendant would have to serve twenty-five years before his earliest release eligibility date when, in fact, he would have to serve fifty-one years. Id. at *5. The Court cited Myer and Douglas, and it concluded that "the defendant was prejudiced by the trial court's erroneous instruction." Id. at *6. Further, the Court

---

[5]Since this crime occurred prior to the July 1, 1995, amendment to the statute, the proper instruction was that the defendant would have to serve a minimum of twenty-five years, not fifty-one years."

stated, "It is conceivable that the defendant would have been convicted of a lesser offense had the jury known that he would not have been eligible for release for fifty-one years as opposed to twenty-five years." Id. The Court reversed the conviction and remanded the case for a new trial.

In State v. Mitchell Shephard, No. E2000-00628-CCA-R3-CD, 2001 WL 767010 (Tenn. Crim. App., at Knoxville, July 3, 2001), *perm. app. granted* (Tenn. Dec. 2, 2002), this Court addressed whether the trial court committed reversible error by improperly instructing the jury with regard to the defendant's punishment. By the time of the Shephard case, the Legislature had again changed the statute and had mandated that the jury not be instructed at all about punishment in first degree murder cases where the State was not seeking the death penalty. Id. at *11. The trial judge, however, had instructed the jury on punishment. Id. Further, the trial judge instructed the jury that the defendant would be eligible for parole after serving a minimum of twenty-five years, rather than fifty-one years. This court held that the instructional error was reversible. Id. It stated, however, "In fairness to the trial court, we again recognize that the trial court gave the 25-year charge as it is stated in Tenn. Code Ann.§ 39-13-204(e)(2)." Id. at *12. The court also said, "In spite of the obvious conflict between Tenn. Code Ann. §§ 39-13-204(e)(2) and 40-35-501(i), the legislature has still not amended Tenn. Code Ann. § 39-13-204(e)(2) (Supp. 2000)." Id. It is hoped that such an amendment will be made to avoid the inconsistency." Id. The Court remanded the case for a new sentencing hearing.

Considering the contentions of the parties, we think the issue before us is twofold. First, we must decide whether Counsel Stubbs was ineffective for failing to request that the jury instruction with regard to release eligibility dates be changed from twenty-five years to fifty-one years. Next, we must decide whether Counsel Stubbs was ineffective for failing to appeal this issue. Accordingly, the time line of the events of this case is relevant. J. Vaughn's case was tried in May of 1996, and the judgment was entered May 31, 1996. The record in this case was filed with this Court on December 19, 1996, and J. Vaughn's brief was filed on February 19, 1997. Oral arguments were heard in December of 1997. This Court entered its judgment and opinion affirming J. Vaughn's conviction on May 21, 1998.

As previously stated, the first issue we must decide is whether Counsel Stubbs was ineffective for failing to request a jury instruction that if the jury convicted J. Vaughn of first degree murder he would be ineligible for parole until he served fifty-one years. At the time of the trial, the Legislature had changed one of the relevant statutes, making the earliest release eligibility date for those convicted of first-degree murder fifty-one years rather than twenty-five years. Since, however, the newly enacted statute did not repeal the twenty-five year statute the law was unclear as to the applicable release eligibility date. At the time of J. Vaughn's trial, the only two cases that were decided were Cook and Smith, and both of those cases dealt with jury instructions about Range I and Range II sentences. Furthermore, the Attorney General's statutory interpretation opinion was not released until more than a year after the trial. While it is arguable that Counsel Stubbs could have anticipated the Attorney General's statutory

interpretation, or our subsequent holdings affirming the Attorney General's opinion, we do not find his performance deficient for failing to do so. As previously stated, <u>Cook</u> was not a first degree murder case, and, as we noted in many of our subsequent holdings, the Legislature's failure to repeal the twenty-five year release eligibility statute made this area of the law confusing. Given this chronology of events, we cannot conclude that Counsel Stubbs' failure to request the jury instruction at trial was ineffective. Furthermore, J. Vaughn cannot show prejudice in this regard. To show prejudice, he would have to prove that, had Counsel Stubbs requested the fifty-one year instruction, the trial court would have instructed the jury accordingly. Considering the state of the law at the time of this trial, however, it is simply impossible to assume that the trial court would have so instructed the jury.

Conversely, in accordance with the aforementioned case law, J. Vaughn could possibly show prejudice with respect to Counsel Stubbs' failure to raise this issue on appeal. However, we conclude that J. Vaughn has not shown that Counsel Stubbs' failure to raise this issue on appeal was deficient. We initially note that Counsel Stubbs could only have brought this issue before the Court under the plain error doctrine, as the instructional error would have been waived for his failure to object to it at trial or in the motion for new trial. <u>See</u> Tenn. R. App. P. 52(b). Again, while it is arguable that Counsel Stubbs could have anticipated this statutory interpretation, and our subsequent holdings in <u>Golden</u>, <u>Douglas</u>, and <u>Milam</u>, we do not find his performance deficient for failing to do so. The record on J. Vaughn's direct appeal was submitted on December 19, 1996, and J. Vaughn's brief was filed on February 19, 1997. Both of these dates were prior to the Attorney General's opinion interpreting the relevant statutes, and prior to all of our opinions confirming that interpretation. We simply cannot conclude that Counsel Stubbs' representation fell below an objective standard of reasonableness because he did not anticipate this interpretation of the statute.

As further support for our holding, we highlight again, by way of analogy, our previous analysis of the <u>Page</u> decision and subsequent post-conviction decisions holding that a petitioner's trial counsel was not ineffective for failing to raise the <u>Page</u> "knowingly" issue on appeal when the law was unclear. Again, ineffective assistance of counsel cases should be limited to situations where the law or duty is clear such that reasonable counsel should know enough to raise the issue. <u>Eady</u>, 2004 WL 587639, at *8. This issue is without merit.

## C. Adequate Trial Preparation

Lastly, J. Vaughn asserts that Counsel Stubbs was ineffective by failing to adequately prepare for trial. He contends that Counsel Stubbs failed to view the area of the Alabama house where the gun was found and that Counsel Stubbs failed to speak with J. Vaughn's relatives in Alabama. Further, J. Vaughn contends that he told Counsel Stubbs that he was in Alabama at the time that the police found the weapon, but Counsel Stubbs did not pursue this information. The post-conviction court found:

When asked about this allegation at the Post-Conviction Relief hearing, [Counsel Stubbs] explained that from the outset of his representation, [J. Vaughn] consistently and adamantly stated that he did not want any of the family in Alabama involved in the case. Further, he maintained that he was never in Sheffield, Alabama and the guns were not his. [Counsel Stubbs'] testimony is extremely credible in this regard because he knew from discovery and talking to witnesses that two Gallatin officers were going to testify to seeing [J. Vaughn] at the Alabama residence and that his uncle, Rearno Vaughn, once he was in custody in the back of the patrol car, begged the officers not to shoot into the Alabama residence and not to kill [J. Vaughn]. [Counsel Stubbs] stated that he discussed this impending testimony with [J. Vaughn]. [J. Vaughn] still maintained to [Counsel Stubbs] that he was never in Sheffield, Alabama. For those reasons [Counsel Stubbs] did not go to Alabama and did not talk to anyone in Alabama.

We conclude that the evidence does not preponderate against the trial court's findings of fact. Further, we conclude that J. Vaughn has not met his burden of proving that Counsel Stubbs' representation of him fell below an objective standard of reasonableness. The post-conviction court found that Counsel Stubbs' testimony was credible, and Counsel Stubbs testified that J. Vaughn told him, unequivocally, that his Alabama relatives were not to be involved in this case. Further, J. Vaughn told Counsel Stubbs that he was never in Alabama. Counsel Stubbs conducted his investigation and formulated J. Vaughn's defense around these statements. Simply because this defense was unsuccessful, J. Vaughn cannot now successfully complain that Counsel Stubbs' performance was deficient. Accordingly, we conclude that J. Vaughn has failed to meet his burden of proving that Counsel Stubbs' representation fell below an objective standard of reasonableness. Furthermore, J. Vaughn has not presented any evidence of how Counsel Stubbs' alleged lack of investigation prejudiced him.

### III. Conclusion

In accordance with the foregoing reasoning and authorities, we affirm the post-conviction court's judgment dismissing J. Vaughn's petition for post-conviction relief.

_____
ROBERT W. WEDEMEYER, JUDGE

–24–